IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

FAYE A. FINLEY                          )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )        CV-96-PT-1610-E
                                        )
AMERICAN GENERAL LIFE AND               )
ACCIDENT INSURANCE CO., INC.            )
                                        )
        Defendant.                      )

*Upg*

**ENTERED**

MAY 8    1997

## MEMORANDUM OPINION

This cause comes on to be heard on the defendant's Motion for Summary Judgment filed

on March 7, 1997. The plaintiff has alleged that the defendant unlawfully discriminated against

her because of her race and gender in violation of Title VII of the 1964 Civil Rights Act, 42

U.S.C. § 2000(e) *et seq.*, as amended by the Civil Rights Act of 1991. The plaintiff also asserts

state law claims under the court's supplemental jurisdiction.

## BACKGROUND

Gulf Life Insurance Company hired Faye Finley (Finley), a black female, as a "home

service" sales agent. Finley's job required her to visit potential customers' homes to try to sell

them insurance policies. In 1991, Gulf Life merged with American General Life and Accident

Insurance Company (AGLA). Finley kept her job with AGLA and began reporting to AGLA's

Anniston, Alabama District Office. Eventually, AGLA transferred Finley to its Childersburg,

Alabama office where her immediate supervisor became Charles Clark (Clark).

In late 1994, AGLA fired Finley because she purportedly committed a major

underwriting violation. AGLA claims that Finley committed a violation by submitting two

markedly different insurance applications for the same individual. Finley claims, however, that

she worked in a sexually and racially hostile work environment and was fired because she

1

complained about the purported harassment to her supervisor. She claims, moreover, that AGLA refused to promote her and later fired her because of racial and sexual animosity toward her.

CONTENTIONS

1. Hostile Work Environment

Finley claims that numerous events combined to create a sexually and racially hostile working environment at the Childersburg office. As evidence of sexual harassment, Finley claims that she was forced to hold the bathroom door closed to assure herself that a male employee would not walk in while she was using the bathroom. The bathroom door did not lock and twice a male co-worker attempted to enter the bathroom while Finley was inside. Once, Finley's supervisor, Charles Clark, opened the door and purportedly stared at Finley's breasts before Finley could close the door.[1] Another time, a male co-worker opened the bathroom door slightly before Finley could pull it closed. Finley purportedly heard the other agents laughing in the background and at least one said, "You weren't able to see nothing, were you?" She complained about these incidents to both Clark and District Manager Wendell Stewart. In response, Stewart told her to have a lock installed on the door. Finley claims, however, that a lock was never installed.

Another time, the male agents in the office were talking about an upcoming operation that Clark planned to undergo. The agents purportedly said, "Charles fixing to get a new dick, y'all." Finley allegedly said, "Don't you all see me sitting here?" but the agents continued to laugh and talk about the operation. She complained to Clark who purportedly told her to ignore the comments.

Still another time, a female customer entered the office to pay her premium. When the customer left, a male agent purportedly said, "I sure would like to stick her tonight. I would like to get between her legs tonight." The other agents allegedly laughed at the comment. Finley again complained to Clark who purportedly remained ambivalent about the perceived problem.

---

[1] Clark admitted to Stewart that he mistakenly opened the bathroom door while Finley was inside. Clark was purportedly embarrassed about the incident and told Stewart that he apologized to Finley more than once.

2

AGLA took no action, Finley argues, to curtail or correct this offensive conduct.

As evidence of a racially hostile work environment, Finley cites only one example. Finley claims that one day she entered the Childersburg office and overheard the white male agents saying that they would not work for a black female. As she walked into the room the agents continued to say, "Ain't no way that we are going to let a black lady be over us as manager telling us what to do."

AGLA argues that Finley's allegations of racially and sexually offensive conduct do not rise to the level of actionable harassment. The sole allegation of racial harassment that Finley cites, the company argues, is isolated and is not sufficiently severe or pervasive to constitute harassment under Title VII. As to the bathroom incidents, AGLA argues that these two events were neither intentional, severe, nor pervasive. AGLA further claims that Finley cannot show how these incidents affected her work performance. As to Finley's remaining allegations, AGLA claims that none of the comments were directed toward her, were not physically threatening nor humiliating, and did not affect her work performance.

AGLA further contends that, other than the bathroom incidents, Finley did not complain to anyone in higher management about the perceived problem. The company claims that the one individual that Finley complained to most, Clark, had no responsibility for investigating harassment issues.[2] Although she did tell Stewart about the bathroom incidents, AGLA contends that such knowledge was insufficient to put the company on notice that a sexually hostile work environment purportedly existed. AGLA contends, moreover, that Finley failed to follow the company's sexual harassment reporting procedure. In any event, AGLA contends that Stewart took appropriate remedial action by telling Finley to have a lock installed on the door.[3]

## 2. Failure to Promote

Finley also contends that AGLA unlawfully failed to promote her to a vacant sales manager position in AGLA's Anniston office in late 1994. Although she did not submit a

[2] Clark purportedly was supposed to report any complaints to Wendell Stewart.

[3] The parties dispute whether a lock was ever installed.

3

written application, Finley purportedly told Clark that she was interested in the job. Apparently at this time, Finley overheard the remarks by the white male agents at the Childersburg office that they would not work under a black female. This purported racial animosity, combined with her sexual harassment complaints, were the reasons that Finley contends prevented her from gaining the promotion.

AGLA contends that it refused to promote Finley for a legitimate and nondiscriminatory reason. District Manager Stewart purportedly did not consider Finley for the position because AGLA was investigating her for the possible underwriting violation. He instead promoted Richard Feenker, a white male, on the recommendation of another retiring District Manager for whom Feenker had worked. AGLA contends that, in any event, Stewart did not know of Finley's interest in the position.[4] Moreover, AGLA argues, the evidence belies Finley's racial claim because the sales manager job that she purportedly sought did not supervise the Childersburg agents who allegedly made the racial comments.

### 3. Termination

Finley contends that AGLA fired her because she complained about the purported sexual harassment. She further contends that AGLA fired her to prevent a black female from becoming sales manager in the district. AGLA claims that it fired her because she committed a major underwriting violation, a legitimate nondiscriminatory reason.

The events surrounding Finley's dismissal are as follows. On September 1, 1994, Finley submitted an insurance application for Carol A. Vincent. AGLA issued the policy. Later, on October 6, 1994, Finley submitted another insurance application for Carol Vincent that contained different information from the September application.[5] Finley claims that her first supervisor

---

[4] In October 1991, Finley signed a Career Objectives Questionnaire from AGLA in which she stated that she was not interested in a management position. Finley testified, however, that she had since changed her mind and wanted to enter management.

[5] On the September application, the Social Security Number was recorded as 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. In October, however, the Social Security Number was recorded as 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. In September, the applicant's height and weight were listed as 5 ft. 7 in. and 237 pounds. In October, however, the same information appeared as 5 ft. 6 in. and 175 pounds. The two applications also had different smoking histories and purportedly dissimilar applicant

4

with Gulf Life trained her to obtain two signed applications from each applicant. She would use the second blank application if she made a mistake on the first application. Finley further claims that Charles Clark, her immediate supervisor after the merger, condoned this practice.[6] Finley admits that she had Carol Vincent sign two applications. She submitted a completed application for Vincent and kept the signed blank application in her records. AGLA issued a policy to Carol Vincent based on the application it received. In October, however, Finley submitted another application for Carol Vincent. She claims that she intended to submit this application for Darlene Vincent.[7] Finley contends that she accidentally submitted Carol Vincent's second signed application instead of Darlene Vincent's application. Finley also claims that due to fatigue, she included additional incorrect information from other applicants on the accidental submission.

On October 20, 1994, District Manager Wendell Stewart received a memo from AGLA stating that the company had recently issued a life insurance policy to Carol Vincent and that it had since received a second application from Carol Vincent. This memo indicated that the applicant's weight was different on each application. Stewart thus requested and received a written explanation of the incident from Finley that he consequently accepted as true.[8] Stewart forwarded Finley's explanation to AGLA. He claims that he did not believe the incident required serious attention at the time because previous counseling had corrected Finley's mistakes. Stewart claims, however, that he had not seen the two applications then and was not aware of any

signatures.

[6] Charles Clark, now dead, was the Sales Manager for the Childersburg office. He had direct supervisory responsibility over Finley and from six to ten other agents. Clark reported directly to District Manager Wendell Stewart. Clark was a "first-level" supervisor and had no authority to hire, discipline, or fire AGLA employees. Affidavit of Wendell Stewart.

[7] Finley claims, moreover, that she agreed to hold the application until after Darlene Vincent's upcoming marriage when her name would change to Darlene Nicks.

[8] Finley's explanation, dated October 25, 1994, stated: "To whom it may concern. This is concerning Mrs. Carol Vincent. Please disregard 2nd application, it was since [sic] to H.O. [Home Office] in error. I got that application mix [sic] up with another application that I wrote on Darlene Vincent. When I write a [sic] application I always get 2 applications sign [sic] at time of writing incase I have a mistake on the 1st application. I got Carol 2nd app. mix [sic] with another application cause this confusion [sic]. Also Mrs. Carol Vincent plan to keep her insurance that is already in force."

5

discrepancies other than weight. In the October 27, 1994 memo to AGLA, Stewart stated, "I do not see any real problem here."

On November 3, 1994, Stewart received a memo from AGLA that stated, "This case will be closed out as requested. Be sure the writing agent knows not to have applicants sign two applications. This could cause problems."[9] AGLA later requested Stewart to conduct a more thorough investigation and to obtain a complete written statement from Finley. Finley thus gave Stewart another written explanation of the incident.[10] On November 17, 1994, AGLA's home office charged Finley with a "Major Underwriting Violation" because she had asked a proposed insured to sign a blank application. In late November or early December, Stewart claims that, for the first time, he reviewed the two applications that Stewart submitted. This was the time when Stewart claims that he first learned of the height, social security number, and smoking history differences. He also claims that the applicants' signatures appeared different, thus raising his suspicion of a forgery.[11] Stewart also claims to have noticed that Finley reported on the second application that Carol Vincent did not have insurance with AGLA. He further noticed that the information on the second Carol Vincent application did not match the information that Finley said belonged on Darlene Nick's application.

At this point, Stewart decided that Finley had lied about the incident. On December 9, 1994, he met with Finley to see if she had other information that might clarify her position. Finley, however, maintained her explanation. Stewart then talked with his supervisor and

---

[9] According to AGLA, this memo meant that the second Carol Vincent application was declined and did not address any disciplinary action toward Finley.

[10] Finley's second explanation, dated November 14, 1994, stated: "Mr. Stewart, this is my statement regarding Carol Vincent as I can remember. I was working on my paper work late Thursday night and early Friday morning for my turn-in. Probably due to my tiredness, sleepiness, and etc. I mixed up the information from one application to the other. (Darlene Vincent information with Carol Vincent information, sometimes I have the applicant signed [sic] two applications as I did in this situation, and this is the reason for the error). In the future, I will disregard my present but sometimes system of the applicant signing two applications. I now realize the seriousness of my doing paper work in the wee hours of the night and I have changed my system of writing application as per my conversation with you, Mr. Stewart. I'm sorry my mistake caused so much confusion. I hope this will cure this matter."

[11] Finley alleges that any differences between the two signatures is because Carol Vincent signed one application against a wall.

decided to recommend Finley's termination to AGLA. On December 16, 1994, AGLA fired Stewart.

Stewart disputes the validity of AGLA's stated reasons for firing her. She claims instead that AGLA fired her in retaliation for complaining about what she perceived was a sexually hostile working environment. Her firing for the alleged underwriting violation, she contends, was pretextual because the incident occurred several months earlier,[12] and was treated as a minor matter at the time. She claims, moreover, that AGLA does not have an express written policy against the practice of having applicants sign an extra blank application. She argues that Stewart's attitude toward the underwriting incident changed from one of recommending counseling to termination when she complained about what she considered was sexual harassment at the Childersburg office.

As evidence that AGLA's stated reason was pretextual, Finley contends that AGLA disciplined three white males differently for their alleged underwriting violations. Specifically, Finley claims that agents Robert Bryant and Terry Jinks were alleged to have submitted applications that the applicants did not themselves sign. Apparently, Stewart took no action against these agents after deciding that the signatures were valid. Another agent, Bob Smith, allowed a wife to sign an application for her husband. Stewart apparently counseled Smith and took no further action because Smith had just merged in from Gulf Life.

### LEGAL STANDARD

On a motion for summary judgment, the court must assess the proof to see whether there is a genuine need for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is appropriate only if this court concludes that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial responsibility of informing this court of

---

[12] The record establishes that the relevant events began in October 1994 and ended in December 1994.

7

the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact.  Id. at 323.  Once the moving party has met this burden, the nonmoving party "must produce evidence that shows there exists a genuine issue of material fact."  Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing there exists a genuine issue for trial. Celotex, 477 U.S. at 324.  The court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . . " in deciding whether to grant or deny a summary judgment motion.  FED. R. CIV. P. 56(c).  In making the determination of whether a given factual dispute requires submission to a jury, the court must view the presented evidence through the prism of the substantive evidentiary burden.  Anderson, 477 U.S. at 254-55.  The court, however, must avoid weighing conflicting evidence or making credibility determinations.  Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).

Considering the above, this court must examine the evidence to decide if there exists a genuine issue of material fact.

## ANALYSIS

### 1. Hostile Work Environment

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000(e)-2(a)(1).  The phrase 'terms, conditions, or privileges of employment' shows Congress' intent "to strike at the entire spectrum of disparate treatment of men and women in employment," which includes requiring people to work in a discriminatorily hostile or abusive work environment.  Harris v.

8

Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993). Where a workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated. Harris, 510 U.S. at 21, 114 S. Ct. at 370.

The Court in Harris reaffirmed that the Title VII standard falls between merely offensive conduct and conduct that causes tangible psychological injury. Id. at 370. Mere utterances of offensive epithets do not violate Title VII. Only conduct that is severe or pervasive enough to create an objectively hostile or abusive work environment falls within Title VII's prohibition. Therefore, the plaintiff must establish that a reasonable person would find the work environment hostile or abusive.

The Court also concluded that a hostile or abusive environment can only be found by viewing the totality of the circumstances. Such circumstances generally include:

> . . . the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employees's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

Harris, 510 U.S. at 23, 114 S. Ct. at 371.

Within this context, Finley must establish her prima facie case by showing that: (1) she belongs to a protected class; (2) she was subjected to unwelcome racial or sexual harassment; (3) the harassment was based on her race or sex; (4) the harassment affected a term, condition, or privilege or employment; and (5) respondeat superior liability. Henson v. Dundee, 682 F.2d 897, 903-05 (11th Cir. 1982).

The court concludes that Finley has not established a prima facie case of a racially hostile work environment. As noted, Finley must show that the harassment was so severe and pervasive as to alter the conditions of her employment and create an abusive working environment. Finley, however, cites only one incident that was racially derogatory. Furthermore, the evidence does not establish that the agent(s)' comment was directed toward

9

Finley or even concerned Finley. Although hearing a racial epithet is offensive, an isolated utterance does not adversely affect a term or condition of employment nor create an abusive environment under Title VII. The defendant's motion will be granted on this claim.

The court also concludes that Finley has not established a prima facie case of a sexually hostile work environment. Finley may have satisfied the first four elements of her prima facie case, although, at best, her case is weak. The examples of harassment she cites were not frequent and she made no showing of how they interfered with her work performance. The severity of her evidence is somewhat undermined because, other than the bathroom incidents, Finley has not established that any conduct involved her in particular. Viewing the totality of the circumstances, however, the court will assume that she has proved a prima facie case.

The court concludes, nevertheless, that she cannot satisfy the element of respondeat superior. Employer liability under a hostile working environment theory only exists if the employer "knew or should have known of the harassment and failed to take prompt reasonable action against the [employee]." Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316, *reh'g denied*, 874 F.2d 821 (11th Cir. 1989); Henson v. City of Dundee, 682 F.2d 897 (11th Cir. 1982). To establish a basis for AGLA's liability for her hostile work environment claim, Finley must show that AGLA either actually or constructively knew of the purported harassment and then failed to take timely remedial action.

Finley complained to "higher management" only once about what she perceived as sexual harassment. This discussion concerned the two incidents when male employees entered the bathroom while Finley was using it. Although Stewart's proposed remedy that Finley have a lock installed may have been questionable in tact,[13] the evidence falls short of establishing that this one complaint was sufficient to place AGLA on actual or constructive notice that an allegedly abusive working environment existed. The bathroom incidents are insufficiently related to the other sexually charged comments that Finley accuses the agents

---

[13] The evidence tends to establish that Wendell Stewart, the only higher management involved, believed that the bathroom incidents were accidental. Nevertheless, Stewart told Finley to have a lock installed on the door.

of making to carry much weight. In any event, Finley has offered no evidence, and does not maintain, that she complained about these other incidents to higher management. Accepting Finley's contentions as true, the evidence establishes that Finley merely complained to her immediate supervisor Clark. The evidence also establishes, however, that Clark was not "higher management" but merely possessed some managerial responsibilities at the Childersburg office. See Kilgore v. Thompson & Brock Management, Inc., 93 F.3d 752, 754 (11th Cir. 1996). Further, Finley has not shown that the purported harassment was so severe as to impute constructive knowledge to AGLA. The court will grant the defendant's motion as to this claim.[14]

### 2. Failure to Promote

Finley also contends that AGLA failed to promote her to the Anniston district Sales Manager position because of her race and her complaints to Clark and Stewart. To prevail in an action alleging either sex or race discrimination by an employer, a plaintiff must prove discriminatory intent. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n.15, 97 S. Ct. 1843, 1854 n.15, 52 L. Ed.2d 396 (1977). Where, as here, the plaintiff relies on circumstantial evidence, the Supreme Court has established a legal framework that allows a court to infer discriminatory intent. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824, 36 L. Ed.2d 668 (1973); Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-56, 101 S. Ct. 1089, 1093-95, 67 L. Ed.2d 207 (1981).

The familiar three-part test is neither rigid nor formalistic, however, and courts should adapt it to the given factual situation. U.S. Postal Service Board of Governors v. Aikens, 460 U.S. 711, 715, 103 S. Ct. 1478, 1482, 75 L. Ed.2d 403 (1983). In the promotion context, the plaintiff must first establish a prima facie case by:

> . . . proving that she is a member of a protected minority, was qualified for and applied for the promotion, was rejected despite these qualifications, and

---

[14] The conduct now complained of, rather than being severe, seems to be conduct recalled to establish a claim to defeat the real reason for the termination.

that other employees with equal or lesser qualifications who were not members of the protected minority were promoted.

Perryman v. Johnson Products Co. Inc., 698 F.2d 1138, 1142 n.7 (11th Cir. 1983) (citing Crawford v. Western Electric Co., Inc., 614 F.2d 1300, 1315 (5th Cir. 1980).

If the plaintiff establishes her prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its employment action. McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824. In cases where the employer fails to meet this burden, judgment must be entered for the plaintiff as a matter of law. Burdine, 450 U.S. at 254, 101 S. Ct. at 1094. For the employer to meet its burden, however, the employer need not persuade the court that its proffered reasons are legitimate. Id. at 254-55, 101 S. Ct. at 1094. At this stage, employers need only produce a legitimate reason, not prove it. See id. Once the defendant has rebutted the employee's prima facie case, the plaintiff must then show by a preponderance of the evidence that a discriminatory intent motivated the employer's action. McDonnell Douglas, 411 U.S. at 804, 93 S. Ct. at 1825. The employee may accomplish this indirectly by showing that the employer's proffered explanation is pretextual, or directly by showing that a discriminatory reason more likely motivated the employer's action. Burdine, 450 U.S. at 256, 101 S. Ct. at 1095. Absent significantly probative evidence, summary judgment will be granted. Isenbergh v. Knight-Ridder Newspaper, 97 F.3d 436, 444 (11th Cir. 1996). Conclusory allegations of discrimination, without more, are insufficient to raise an inference of pretext or intentional discrimination where the employer offers extensive evidence of legitimate, nondiscriminatory reasons for its actions. Isenbergh, 97 F.3d at 444. The paramount inquiry therefore remains whether the employee has offered evidence sufficient to create a reasonable inference that the employer intentionally discriminated against her.[15]

Finley satisfies the first prong of her prima facie case because she is black and female,

---

[15] To survive a summary judgment motion, the employee must present concrete evidence in the form of specific facts that show that the defendant's proffered reasons are pretext. The fact that the employer's decision is unfair is inadequate to survive a properly supported summary judgment motion. Courts, moreover, generally have no authority to second guess managerial decisions made in good faith.

both protected classes. She also satisfies the third and fourth prongs because she did not receive the promotion and, debatably, an equally or lesser qualified person was promoted. The second prong is arguably not satisfied, however, because Finley claims to have only told her immediate supervisor, Clark, that she wanted the promotion. The undisputed evidence establishes that Clark had no hiring authority. Although AGLA has no formal application process for sales manager positions, logic dictates that some individual with hiring authority must know of an employee's desires to, in turn, consider that employee for promotion. Finley has offered no evidence showing that Stewart knew of her desire for the Anniston position or that she even wished to be considered for management in general. The court accordingly concludes that no decision maker knew that Finley sought the subject promotion. Finley's prima facie thus accordingly fails.

In any event, AGLA has articulated a legitimate, nondiscriminatory reason for not promoting Finley. The company did not consider anyone who was under investigation for an underwriting violation as Finley was. Although Finley claims that AGLA's decision was somehow tied to her complaints and race, Finley submits no evidence other than her generalized conclusion to show this purported connection. AGLA's stated reason, therefore, legally rebuts Finley's claim that she was unlawfully denied that promotion. Although Finley does not specifically contend in her brief that AGLA's stated reason is pretextual, the court will address the pretext issue under the context of Finley's termination claim, as the two are intertwined. The court will grant the defendant's motion for summary judgment on this claim.

### 3. Termination

Although the court defines this claim as a termination claim, the analysis is the same as if it were an express retaliation claim under Title VII. Title VII prohibits an employer from discriminating against an employee because the employee has opposed any practice made an unlawful employment practice, or because the employee has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing. See 42 U.S.C. § 2000(e)-3(a). To state a prima facie case of retaliatory discharge, the

13

employee must establish: (1) that she engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding, (2) was disadvantaged by an action of the employer simultaneously with or subsequent to such opposition or participation, and (3) that there is a causal connection between the protected activity and the adverse employment action. Morgan v. City of Jasper, 959 F.2d 1542, 1547 (11th Cir. 1992). In analyzing such claims:

> The first element is established if the plaintiff can show that he opposed an unlawful employment practice which he reasonably believed had occurred. Evidence that the protected activity and the adverse employment action were not totally unrelated satisfies the third prong of proof of a prima facie case. Where a plaintiff has failed to produce direct evidence of discrimination, a defendant employer may rebut the prima facie case of retaliation by articulating legitimate reasons for the employment action, whereupon the plaintiff must prove by a preponderance of the evidence that the employer's articulated reasons constitute a pretext for discrimination. In rebutting the plaintiff's prima facie case, a defendant employer must only produce credible evidence supporting its legitimate reasons. The employer does not bear the burden of persuasion. That burden remains with the plaintiff and is carried with evidence that the plaintiff's engagement in protected activity was a significant factor in the employer's decision.

Bigge v. Albertsons, Inc., 894 F.2d 1497, 1501-02 (11th Cir. 1990) (citations omitted).

Assuming that Finley has established a prima facie case that she was fired in retaliation for pressing her complaints and because she is black, which is dubious at best, AGLA has articulated a legitimate, nondiscriminatory reason for its employment decision. The evidence establishes AGLA's chronological and detailed examination of Finley's purported underwriting violation leading to her eventual firing. The court further concludes that AGLA's stated reason overwhelmingly rebuts her prima facie case. See Grigsby v. Reynolds Metals Company, 821 F.2d 590 (11th Cir. 1987) ("Where the defendant's justification evidence completely overcomes any inference to be drawn from the evidence submitted by the plaintiff, the district court may properly acknowledge that fact and award summary judgment to the employer.")

Finley contends, however, that AGLA's stated reason is pretextual. Finley's

14

allegation supporting her claim is that discrimination <u>must</u> have played a role in Wendell Stewart's attitude change toward the incident. She argues that during the course of little more than a month Stewart decided that counseling was an insufficient remedy to the incident and decided to fire her. Finley, however, cites no evidence to support this connection other than her generalized conclusion that discrimination <u>must</u> have been the deciding factor. Unsupported arguments or theories are not significantly probative of discrimination nor do they constitute concrete evidence in the form of specific facts that show that the defendant's proffered reasons are pretext. <u>See generally Isenbergh v. Knight-Ridder Newspaper</u>, 97 F.3d 436 (11th Cir. 1996). In any event, AGLA has adequately explained why it eventually chose to fire Finley after first stating that counseling was appropriate.

Finley also attempts to support her pretext argument by showing that AGLA treated three white male agents less harshly for purportedly similar incidents. An employee who is fired by her employer can show that her employer violated Title VII if she establishes that she is a member of a protected class, that she was qualified for the job from which she was fired, and that the misconduct for which she was fired was nearly identical to that engaged in by an employee outside the protected class whom the employer retained. <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181, 1185 (11th Cir. 1984). When a fired employee proves that her employer retained another employee outside her protected class despite violating the same work rule, an inference arises that the employer discriminatorily applied its rule. <u>Nix</u>, 738 F.2d at 1186. The plaintiff, however, carries the burden of showing the similarity between her conduct and that of the purportedly similarly situated employee. <u>Jones v. Gerwens</u>, 874 F.2d 1534, 1541 (11th Cir. 1989).

Finley notes that Stewart took no action against two white male agents who, at first, were suspected of submitting forged signatures. She also notes that Stewart took no action against a third white male agent who, while working with Gulf Life, allowed an applicant's spouse to sign for the applicant. These individual's situations were not <u>nearly identical</u> to Finley's. The two agents suspected of forgery were eventually cleared of any wrongdoing. The third agent was simply counseled because the purported violation occurred before the agent became an employee of AGLA. The court notes that the comparators were merely

15

involved in signature disputes over single applications that they submitted. AGLA cleared two agents of any forgery accusations.[16]   The third agent's situation was different because he had a close relative sign for the <u>actual</u> applicant. None of the comparators were accused of submitting two different applications under one applicant's name. The most distinguishing aspect of Finley's situation is that, aside from her suspected forgery, she submitted two applications under the same applicant's name with different weight, social security numbers, height, and smoking histories. These additional factors make her situation considerably different than her comparators. Beyond this evidence, and perhaps the most troublesome aspect of Finley's situation, is that she said she intended to submit an application for Darlene Nicks -- however, she included some information that was neither correct for Carol Vincent nor Darlene Nicks. The court concludes, therefore, that significant differences exist between Finley's situation and the comparators' situation. The court further concludes that no reasonable inference arises <u>from the evidence</u> that shows pretext or intentional discrimination. The defendant's motion will accordingly be granted.

### 4. State Law Claims

Since the court will dismiss all federal claims, it will not accept jurisdiction of the state law claims which are only supplemental. They will be dismissed without prejudice.

This ___8th___ day of ___May___, 1997

Robert B. Propst
Senior United States District Judge

---

[16] Finley, however, is apparently still suspected of forgery.

16